UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                           :

UNITED STATES OF AMERICA
                                           :

                -v.-                      :              S2 17 Cr. 638 (RWS)

                                           :

JOEL MARGULIES,
                                           :

                     Defendant.        :

                                         :
-------------------------------------------------------------x


## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO MARGULIES' PRETRIAL MOTIONS AND MOTIONS *IN LIMINE*

                                    GEOFFREY S. BERMAN
                                    United States Attorney for the
                                    Southern District of New York
                                    One St. Andrew's Plaza
                                    New York, New York 10007

Negar Tekeei
Christine I. Magdo
Assistant United States Attorneys
      -Of Counsel-

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND .............................................................................................................. 2

DISCUSSION .................................................................................................................. 10

    I.    MARGULIES' MOTION TO SEVER BASED ON IMPROPER JOINDER UNDER RULE 8(a) SHOULD BE DENIED. ..................................................... 10

        A.    Applicable Law.................................................................................... 11

        B.    Discussion.......................................................................................... 13

    II.    MARGULIES' MOTION *IN LIMINE* SHOULD BE DENIED ................................. 28

    III.    MARGULIES' MOTION FOR ATTORNEY-CONDUCTED VOIR DIRE IS MERITLESS AND SHOULD BE DENIED .................................................. 28

    IV.    MARGULIES' MOTION *IN LIMINE* REGARDING CO-DEFENDANTS' SENTENCING EXPOSURE.................................................................. 30

    V.    MARGULIES' MOTION FOR ITEMIZED DISCLOSURE OF *GIGLIO* AND *BRADY* MATERIAL SHOULD ALSO BE DENIED ...................................... 31

CONCLUSION.................................................................................................................. 32

## PRELIMINARY STATEMENT

The Government respectfully submits this response to defendant Joel Margulies' (the "Defendant" or "Margulies") motion (1) to sever counts and (2) *in limine* "against evidence from severed counts being used in the trial of remaining count(s)." (Dkt. No. 113).

For the reasons below, each of these motions is meritless and should be denied.

At its core, the Defendant's motion for severance argues that certain counts in the Superseding Indictment should be severed from one another because the offenses charged do not meet the requirements for joinder under Rule 8. The Defendant also argues that severance is warrant because of the prejudice he would suffer were a jury to consider of all counts in the Superseding Indictment at the same trial. Because, as detailed below, the charges in the Superseding Indictment are either of a same or similar character, based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan, they are properly joined in a single indictment. Moreover, because the Defendant has not made a showing of any prejudice – let alone substantial prejudice as is required under the law – the counts should not be severed and the Defendant's motion should be denied.

The Defendant's motion *in limine* to preclude 404(b) evidence in trials on severed counts is similarly unavailing. Evidence of *all* the Defendant's charged crimes would be admissible – either as direct evidence or as 404(b) evidence – at any trial involving severed counts, and, therefore, this motion, too, should be denied.

In addition, on December 2, 2018, Margulies filed three motions, to which the Government now responds: a "Motion for Attorney Conducted Voir Dire" (Dkt # 96), a "Motion in Limine [for] Permission to Present Evidence of Co-Defendant Sentencing Exposure" (Dkt # 97), and a "Motion for Itemized Disclosure of Giglio/Brady Material" (Dkt # 98). As set forth

below, with an exception regarding certain cross-examination of co-defendant Bershan, these motions should also be denied.

## BACKGROUND

Indictment S2 17 Cr. 638 (RWS), filed December 19, 2018 (the "Indictment"), charges the Defendant with the following offenses: (1) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count One); (2) wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 (Count Two); (3) aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A and 2 (Count Three); (4) conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371 (Count Four); (5) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2 (Count Five); (6) wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 (Count Six); (7) conspiracy to distribute narcotics, in violation of Title 21, United States Code, Section 846 (Count Seven); and (8) illegal transportation of a firearm, in violation of Title 18, United States Code, Sections 922(a)(5), 924(a)(1)(D) and 2 (Count Eight).

As charged in the Indictment, the Defendant, along with co-conspirators Lisa Bershan ("Bershan")[1] and Barry Schwartz[2] ("Schwartz"), conspired over the course of at least four years to defraud investors in two companies.

First, the Defendant and his co-conspirators schemed to defraud investors in All American Pet Company, Inc. (the "AAPT Fraud"), conduct that forms the basis for Counts One and Two of the Indictment. As described in more detail below, in connection with the AAPT Fraud, the Defendant stole the identities of real individuals, which forms the basis for Count Three of the Indictment.

Second, overlapping in time with the AAPT Fraud, the Defendant and his co-conspirators schemed to defraud investors in a company originally known as The Awake Company and later renamed Starship Snacks Corp. (the "Starship Fraud"), which forms the basis for Counts Four,

---

[1] On December 18, 2018, Bershan pled guilty, pursuant to a cooperation agreement, to a nine-count superseding Information, which contained the following charges: (1) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count One); (2) wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 (Count Two); (3) aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A and 2 (Count Three); (4) conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371 (Count Four); (5) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2 (Count Five); (6) wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 (Count Six); (7) money laundering, in violation of Title 18, United States Code, Sections 1956(a)(B)(ii) and 2 (Count Seven); (8) conspiracy to distribute narcotics, in violation of Title 21, United States Code, Section 846 (Count Eight); and (9) illegal receipt of a firearm purchased outside of state of residence, in violation of Title 18, United States Code, Sections 922(a)(3), 924(a)(1)(D) and 2 (Count Nine). Bershan's sentencing is scheduled for April 18, 2019.

[2] On August 20, 2018, Schwartz pled guilty, pursuant to a non-cooperation plea agreement, to conspiring to commit securities fraud and wire fraud from at least in or about August 2015 through August 2017, in violation of Title 18, United States Code, Section 371. Schwartz was scheduled to be sentenced the week of February 11, 2019, but the Court adjourned the sentencing to a date yet to be determined.

Five, and Six of the Indictment.  In connection with the Starship Fraud, the Defendant and

Bershan used misappropriated Starship investor funds to, among other things, purchase and

distribute cocaine, conduct that forms the basis for Count Seven of the Indictment (the

"Narcotics Conspiracy").  Also in connection with the Starship Fraud, when Bershan was

threatened by an aggrieved investor, the Defendant illegally transported a firearm to Bershan for

her protection, conduct that forms the basis for Count Eight of the Indictment (the "Firearm

Transportation").  Like the cocaine, the hand gun was purchased using funds misappropriated

from Starship investors.

  The Government expects to prove at trial that the Defendant and his co-conspirators

perpetrated the AAPT Fraud and the Starship Fraud together using the same or similar types of

materially false representations and during overlapping time periods, and that the Narcotics

Conspiracy and Firearm Transportation are connected to the Starship Fraud.[3]

---

[3] The original indictment, Indictment 17 Cr. 638 (RWS), which was filed on October 13, 2017, charged the Defendant, Bershan, and Schwartz with (a) participating in a conspiracy to commit wire fraud and securities fraud, (b) securities fraud, and (c) wire fraud.  Since then, the Government has continued to investigate the defendant and his co-conspirators, and the Government has developed additional evidence that led to the charges in the Superseding Indictment.  In his motion, the Defendant alleges that "[a]fter Margulies' arrest and arraignment on the original Indictment the Government informed Margulies that if he would not change his plea that the Government would consider superseding the indictment to add charges of providing cocaine to Bershan on a number of occasions, providing an unregistered / licensed firearm to Bershan, and engaging in another fraudulent scheme . . . known as All American Pet[.]"  Def. Mot. at 2.  The Defendant also alleges that "[w]hen Margulies refused to plead guilty the Government made good on the threat and superseded with the current indictment."  Def. Mot. at 2.  These assertions mischaracterize the nature of the discussions the undersigned attorneys had with defense counsel in advance of the superseding Indictment.  To be clear, the undersigned attorneys conveyed to defense counsel that the Government's investigation was ongoing, and that the Government intended to seek additional charges based on evidence it had obtained regarding the defendant's participation in the AAPT Fraud, cocaine distribution, and illegal firearm transportation.

# I. AAPT Fraud (2013-2017)

Beginning in at least October 2013, the Defendant, Bershan, and Schwartz attempted to raise money from investors in AAPT, a company that marketed and sold food bars and other products for dogs. (Indict. ¶ 1). AAPT's stock was publicly traded on the over-the-counter ("OTC") market. (*Id.* ¶ 2). The Defendant was in charge of marketing and investor relations for AAPT; and Schwartz and Bershan were at various times the President or Chief Executive Officer of AAPT. (*Id.* ¶ 3). The Defendant and his co-conspirators attempted to raise funds for AAPT by seeking loans from AAPT investors based on several misrepresentations, including the following:

      (a) that the Internal Revenue Service (the "IRS") had accepted a settlement offer in compromise (the "Offer in Compromise") from AAPT that significantly reduced back taxes AAPT owed to the IRS;

      (b) that Bershan had paid to the IRS the amount of the Offer in Compromise and had thus absolved AAPT of its outstanding tax liability;

      (c) that Bershan was the beneficial owner of a bank account (the "Beneficial Bank Account") containing over $6.9 million; and

      (d) that Bershan would personally guarantee some of the loans.

(*Id.* ¶ 5). However, as the Defendant knew, the IRS had not accepted an Offer in Compromise from AAPT, AAPT still owed significant amounts to the IRS, the Beneficial Bank Account did not exist, and neither Bershan nor AAPT had assets that could guarantee the loans. (*Id.*). Based these misrepresentations, the Defendant and his co-conspirators raised at least approximately $500,000 from investors, which funds the conspirators misappropriated for their own use. (*Id.* ¶¶ 5-6).

In early 2015, the Defendant and his co-conspirators turned their efforts from the AAPT Fraud to the Starship Fraud. Then, in 2016, as the Starship Fraud began to unravel, the Defendant

and Bershan attempted to revive the AAPT Fraud, by soliciting investments based on the following misrepresentations, among others:

    a.  that Nestlé U.S.A. ("Nestlé") – a component of Nestlé SA, the international food and beverage company headquartered in Switzerland – had approached AAPT about the exclusive licensing of AAPT's patent;

    b.  that Nestlé wished to merge AAPT into Nestlé; and

    c.  that, in connection with such an merger, Nestlé was prepared to assume the outstanding debt of AAPT and to issue shares of Nestlé to current AAPT shareholders.

(*Id.* ¶ 7).  In truth, Nestlé had not approached AAPT or put forth any proposal to license AAPT's patent, to merge AAPT into Nestlé, to assume AAPT's outstanding debt, or to issue Nestlé shares to AAPT shareholders.  (*Id.*).

## II.    Aggravated Identity Theft in Connection with AAPT Fraud

The Government expects the evidence at trial will establish that, in connection with his efforts to raise funds from AAPT investors from 2013 through 2017, the Defendant used the names of real individuals, without their knowledge or consent, to create fraudulent letters and documentation that he and his co-conspirators provided to AAPT investors.  For example, in attempting to raise funds based on misrepresentations regarding Nestlé, the Defendant fraudulently created letters with the name and purported signature of an individual who works for a component of Nestlé, and sent those letters to AAPT investors.  (*See id.* ¶ 13).  The Government expects the evidence at trial will demonstrate that the real individual ("Victim-1") did not know the Defendant, and did not authorize the Defendant to use Victim-1's name or purported signature in any way.  In addition, in connection with efforts to raise money for AAPT in late 2013 and 2014, the conspirators transmitted a false letter, purportedly from the IRS and purportedly signed by an IRS employee, to AAPT investors.  The Government expects the

evidence at trial will demonstrate that the real IRS employee did not author the letter in question, and did not authorize the conspirators to use her name or signature in any way. The Defendant's unauthorized use of other individuals' names and signatures in connection with the AAPT Fraud forms the basis for the aggravated identity theft charge, Count Three, in the Indictment.

## III.    Starship Fraud (2015-2017)

Beginning in mid-2015, the Defendant, along with co-conspirators Bershan and Schwartz, began selling stock in a company that was initially called the Awake Company but later renamed "Starship Snacks" ("Starship"). (Indict. ¶ 15). The Defendant and his conspirators raised more than approximately $2 million from Starship investors based on the following misrepresentations, among others:

   a.   that investments in Starship were guaranteed against losses;

   b.   that Starship was going to be acquired by Monster Beverage Corp. in a transaction that would be extremely lucrative for Starship investors;

   c.   that Starship was engaged in actual product development and had procured sample products; and

   d.   that the Defendant, Bershan, and Schwartz had entered into non-disclosure agreements ("NDAs") with Monster that prohibited them from discussing Starship's purported acquisition by Monster and its purported product development.

(Indict. ¶ 17; October 6, 2017 Complaint ("Compl.") Compl. ¶ 9). However, as the Defendant knew, there were no assets that could guarantee investments in Starship against losses; Monster had no plans to acquire Starship; Starship had not developed a product; and neither Margulies, Bershan, nor Schwartz had entered into any NDAs with Monster. (Indict. ¶ 17).

First, with respect to the guarantees of investment, the Defendant and his co-conspirators made guarantees that they had no ability or intention of honoring in order to make investments in Starship seem safer than they actually were. Bershan and Margulies, for example, signed

investment documents providing that Starship and Bershan would repurchase investors' shares at the price that they had paid for them, plus 5% interest, if those shares had not appreciated within a year. (Compl. ¶ 11(b)(i)). To make the guarantees seem more plausible, Bershan also sent investors images of herself in what appeared to be a mansion with subject lines like, "Just a glimpse—my parents sure as hell didn't leave me this." (*Id.* ¶ 11(b)(ii)). Neither the Defendant, Bershan, nor Starship, however, had the financial means to honor these guarantees. (*See id.* ¶ 13). Indeed, the Government expects the evidence at trial will demonstrate that the Defendant knew that Bershan had no ability to honor the guarantees because, among other things, (a) he had been involved with creating fake bank statements for the Beneficial Bank Account in connection with the AAPT Fraud, and (b) was aware that Bershan had been unable to pay back investor loans in connection with the AAPT Fraud.

Second, the Defendant and his co-conspirators made repeated fraudulent representations that Starship was on the verge of being acquired by Monster Beverage Corp. ("Monster"), a publicly-traded company. In or about October 2015, for example, Margulies sent an email to multiple investors stating, "[t]he deal as I am certain you have heard is done thanks in no small part to the extraordinary talents and skills of our CEO, Lisa Bershan. If you are not aware of the deal, it is a one to one -- share for share exchange of [Starship] for Monster after a six month holding period of [Starship] shares." (*Id.* ¶ 12(a)(i)). Given that Monster's stock was, at the time, trading at many multiples of the price of Starship stock that Starship investors had paid, this purported transaction would have resulted in tremendous gains for Starship investors. But Starship was never acquired by Monster or any other entity, and, indeed, was never in negotiations to be acquired by Monster. (*See id.* ¶¶ 12, 14).

Third, the Defendant and his co-conspirators misrepresented the nature and progress of Starship's purported business to investors. The conspirators told investors that Starship had developed its signature product, when, in reality, it had not done so. (*See id.* ¶ 15). In order to mislead investors into thinking that the product was further along than it actually was, the conspirators actually provided samples of ordinary chocolates to certain investors, falsely telling them that the chocolates were caffeinated as per Starship's business plan. (*See id.* ¶¶ 15-16).

In total, the Defendant and his co-conspirators raised more than approximately $2 million from investors based on these false representations. (*Id.* ¶ 18(b)). Much of this amount was simply misappropriated by Bershan and Schwartz, who spent more than $39,000 on plastic surgery; over $209,000 on retail purchases, including jewelry, clothes, and interior decorating; over $11,900 at a Mercedes dealership; and hundreds of thousands of dollars on luxury housing. (*Id*. ¶ 18(c)). Margulies, however, also benefited from the theft of investor funds, as he was paid by Bershan and Schwartz with investor money. (*Id.* ¶ 18(c)(vii) (alleging that, among other things, "[t]ens of thousands of additional dollars were used . . . to write checks to Margulies").

## IV.    The Drug Conspiracy

The Defendant also benefitted from the Starship Fraud by using misappropriated Starship funds to purchase and distribute cocaine to Bershan and for his own personal use. (Indict. ¶ 28). On multiple occasions from at least approximately October 2015 through approximately August 2017, Bershan transmitted funds to a co-conspirator not named in the Indictment ("CC-2"), either directly or through the Defendant, for the express purpose of purchasing cocaine. (*Id.*). At the time, Bershan's income consisted entirely of misappropriated Starship investor funds, which she deposited into the Defendant's bank account or otherwise transmitted to the Defendant or CC-2 to purchase cocaine. The Government expects the evidence at trial will demonstrate that

CC-2, using a Federal Express account set up and maintained by the Defendant, then shipped quantities of cocaine from California to the Defendant in Tennessee. (*Id.*). The Defendant then shipped quantities of cocaine from Tennessee to Bershan in Manhattan, New York. (*Id.*).

### V.     The Firearm Transportation

As the Starship Fraud began to unravel in 2016, and victim investors began to attempt to hold the Defendant and Bershan accountable, an investor ("Investor-2" in the Indictment) sought to redeem Investor-2's investments in Starship. (*Id.*). Investor-2 sent text messages to Bershan which Bershan perceived to be intimidating and, as a result, Bershan told the Defendant that she was afraid for her safety and wanted to obtain a firearm. (*Id.*). On or about November 12, 2016, the Defendant, who then resided in Tennessee, purchased a Smith & Wesson Bodyguard .380 ACP hand gun with serial number KDX5334 (the "Gun") from a retail store in Tennessee. On or about November 14, 2016, the Defendant, who was not a licensed importer, manufacturer, dealer, and collector of firearms, sent the Gun via a commercial interstate carrier to Bershan in Manhattan. (*Id.*). At the time, the Defendant knew, and had reason to know, that Bershan resided in New York and that Bershan was not a licensed importer, manufacturer, dealer, and collector of firearms. Bershan reimbursed the Defendant for the cost of the gun, using funds that the Defendant knew to be misappropriated from Starship investors.

## DISCUSSION

### I.      MARGULIES' MOTION TO SEVER BASED ON IMPROPER JOINDER UNDER RULE 8(a) SHOULD BE DENIED.

The Defendant seeks to sever the counts of the Indictment so that he can have three trials: (1) one trial for the AAPT Fraud, to include the aggravated identity theft charge in Count Three; (2) one trial for the Starship Fraud; and (3) one trial for the Narcotics Conspiracy and the Firearm Transportation. This construction ignores the plain language of Rule 8(a) and Second

Circuit precedent. Because the conduct alleged in the AAPT Fraud and the Starship Fraud –

including the Defendant's use of stolen identities to perpetrate the AAPT Fraud, his supplying of

cocaine (using Starship investor funds) to his fraud scheme co-conspirator, Bershan, and his

illegal transportation of a firearm to Bershan so that she could protect herself from one of their

fraud victims – is unified by common factual elements and participants, it is properly charged in

one Indictment. Accordingly, the motion should be denied.

### A.       Applicable Law

Rule 8(a) of the Federal Rule of Criminal Procedure provides:

> Joinder of Offenses. The indictment or information may charge a
> defendant in separate counts with 2 or more offenses if the offenses
> charged—whether felonies or misdemeanors or both—are of the
> same or similar character, or are based on the same act or
> transaction, or are connected with or constitute parts of a common
> scheme or plan.

The Second Circuit has interpreted Rule 8(a) as providing a liberal standard for joinder of

offenses. *See United States* v. *Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988). "'Similar' charges

include those that are 'somewhat alike,' or those 'having a general likeness' to each other."

*United States* v. *Rivera*, 546 F.3d 245, 253 (2d Cir. 2008) (quoting *United States* v. *Werner*,

620 F.2d 922, 926 (2d Cir.1980)). Courts also have found joinder proper for distinct criminal

acts where they originated from a common scheme. *Werner*, 620 F.2d at 927 (citing *United

States* v. *Rabbitt*, 583 F.2d 1014, 1021 (8th Cir. 1978)). Important policy considerations "of

trial convenience and economy of judicial and prosecutorial resources" also support Rule 8(a)

joinders. *Werner*, 620 F.2d at 928. Moreover, "'[j]oinder is proper where the same evidence

may be used to prove each count,'" *United States* v. *Page*, 657 F.3d 126, 130 (2d Cir. 2011)

(quoting *United States* v. *Blakney*, 941 F.2d 114, 116 (2d Cir. 1991)), or if "the counts have a

'sufficient logical connection,'" *id.* (quoting *United States* v. *Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990)).

Rule 14 of the Federal Rules of Criminal Procedure provides that where joinder "appears to prejudice a defendant or the government, the court may order separate trials of counts . . . or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Prejudice under Rule 14 must be viewed through the lens of Rule 8's embedded policy determination that interests of judicial economy and efficiency outweigh certain potential prejudices against defendants. *See Richardson* v. *Marsh*, 481 U.S. 200, 210 (1987); *United States* v. *Turoff*, 853 F.2d at 1042. "Given the balance struck by Rule 8, which authorizes some prejudice against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice." *United States* v. *Amato*, 15 F.3d 230, 237 (2d Cir. 1994) (internal quotation marks and citation omitted). Indeed, the Supreme Court has counseled that a district court should grant severance under Rule 14 only if there is a "'serious risk'" that a joint trial would compromise a "'specific trial right'" or "'prevent the jury from making a reliable judgment about guilt or innocence.'" *United States* v. *Gracesqui*, No. 10 Cr. 74 (PKC), 2015 WL 5231168, at *4 (S.D.N.Y. Sept. 8, 2015), aff'd, 730 Fed. App'x 25 (2d Cir. 2018) (denying motion for severance of counts under Rule 14(a) and quoting *Zafiro* v. *United States*, 506 U.S. 534, 539 (1993)).

Moreover, Rule 14 "'leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.'" *Page*, 657 F.3d at 130 (quoting *Zafiro* v. *United States*, 506 U.S. at 539). "[L]ess drastic measures [than severance], such as limiting instructions, often will suffice to cure any risk of prejudice and permit joinder." *Id.* (internal quotation marks and citation

omitted). Thus, the "principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

**B.     Discussion**

### 1.     All Counts are Properly Joined Under Rule 8

All counts of the Indictment are properly joined because they are either (a) of the same or similar character, (b) based on the same act or transaction, or (c) are connected with or constitute parts of a common scheme or plan.  Fed. R. Crim. P. 8(a).

<u>First</u>, the AAPT Fraud Counts and Starship Fraud Counts involved the same co-conspirators – the Defendant, Bershan, and Schwartz – who, as described in further detail below, used the same or similar tactics and categories of misrepresentations to perpetrate both schemes, and, at times, used the same bank accounts to funnel misappropriated investor funds.  In addition, the Government expects the evidence at trial will demonstrate that some of the Starship Fraud victims were AAPT stockholders (although they were not, as far as the Government is currently aware, the same AAPT investors who were pitched to loan or duped into loaning AAPT money in connection with the AAPT Fraud).

<u>Second</u>, the AAPT Fraud Counts and Starship Fraud Counts took place during overlapping time periods.  From approximately October 2013 through January 2015, the Defendant, Bershan, and Schwartz raised and attempted to raise funds for AAPT, significant amounts of which they misappropriated.  The Government expects the evidence at trial will show that, as the conspirators' efforts to continue the AAPT Fraud were diminishing, the Defendant, Bershan and Schwartz began ramping up the Starship Fraud.  Then, *while in the midst of the Starship Fraud*, in approximately January and February of 2016, the Defendant and Bershan began to attempt to revive the AAPT Fraud with additional misrepresentations to investors

designed to raise interest and generate funding.  Like the AAPT Fraud, the Starship Fraud also lasted well into 2017.

Third, the AAPT Fraud Counts and Starship Fraud Counts involved misrepresentations of a substantially similar nature.  As described above, the misrepresentations to investors in AAPT included (a) false assurances regarding Bershan's personal wealth, (b) fraudulent guarantees of repayment, and (c) the false assertion that another company (Nestlé) was interested in merging with AAPT and issuing shares to current AAPT shareholders.  In strikingly similar fashion, the misrepresentations to investors in Starship also included, among other things, (a) false assurances regarding Bershan's personal wealth, (b) fraudulent guarantees against losses, and (c) the false assertion that another company (Monster) was going to acquire Starship, thereby causing Starship shares to convert into Monster shares.  Indeed, the Defendant's fraudulent misrepresentations to AAPT investors regarding Nestlé merging with AAPT occurred *at or around the same time* that the Defendant was fraudulently misrepresenting to Starship investors that an acquisition by Monster was imminent.  The Defendant attempts to obfuscate these glaring similarities by pointing to irrelevant differences between AAPT and Starship, for example, the type of products the companies made or purported to make (pet food versus caffeinated human food), their geographic location, or the fact that the AAPT Fraud involved loans backed by fraudulent guarantees while the Starship Fraud involved investments backed by fraudulent guarantees.  To begin with, as described above, the AAPT Fraud continued during the time period of the Starship Fraud, even when the conspirators relocated from California to New York (Bershan and Schwartz) and Tennessee (the Defendant).  Moreover, any differences in product type or the method of obtaining funds (loan versus stock certificate) are peripheral to the core of each fraud scheme and the strikingly similar methods used to perpetrate both schemes.

Fourth, the Government expects the charges related to the AAPT Fraud Counts and the Starship Fraud Counts will be proven through overlapping evidence, including victim-witness testimony, emails, electronic evidence recovered from the Defendant's and his co-conspirators' electronic devices, and bank account records that will establish the nature of each scheme and the Defendant's knowing participation in each scheme.

Finally, the Narcotics Conspiracy and Firearm Transportation Counts are directly related to and intertwined with the Starship Fraud. The Government expects the evidence to show that the Defendant and Bershan used misappropriated Starship investor funds to purchase and distribute the cocaine in the Narcotics Conspiracy and to purchase the firearm in the Firearm Conspiracy, thus connecting them to the Starship Fraud.[4] And, with respect to the Firearm Transportation, the reason the Defendant illegally sent a firearm to Bershan was so that she could protect herself from perceived Starship investor threats in the middle of the Starship Fraud. Such evidence goes directly to the Defendant's knowledge of the fraud – victims were so upset about the fraud that at least one was lodging threats that caused the Defendant to supply his co-conspirator with a firearm. Courts have routinely allowed joinder of firearm charges with fraud charges when the conduct is directly related and the evidence is so intertwined. *See, e.g.*, *United States* v. *Evans*, No. 09-CR-376A (SR), 2010 WL 1875748, at *3 (W.D.N.Y. May 10, 2010) (denying motion to sever felon in possession of a firearm count from counterfeit fraud counts, finding the defendant (a) failed to establish that he would suffer substantial prejudice from the charges being tried together, (b) the evidence indicated the charges were related, and (c) evidence of both charges was similar and overlapped); *United States* v. *Sides,* 762 F.2d 1013 (6th

---

[4] Indeed, to the extent the Defendant intends to argue that he did not receive a benefit from his participation in the Starship Fraud, the cocaine he purchased using misappropriated Starship investor funds – in addition to the cash he received from his conspirators – is one benefit.

Cir. 1985) (finding joinder to be appropriate where charges of counterfeit savings bonds located in one suitcase and a firearm found in another suitcase in the same vehicle were connected and part of a common scheme); *see also United States* v. *Jones*, 530 F.3d 1292, 1299 (10th Cir. 2008) (defendant had not been prejudiced by joinder of bank fraud and conspiracy counts with drug and firearm counts, since there was overwhelming evidence of guilt as to drug trafficking and firearm charges and bank fraud and conspiracy charges and trial court issued careful limiting instruction to jury on issue of possible prejudice resulting from joinder); *United States* v. *Thompson*, 690 F.3d 977, 989–90 (8th Cir. 2012) (district court did not err in denying motion to sever firearms charge from gambling and marriage fraud charges, where evidence of each crime would have been probative and admissible at the defendant's separate trial of the other crime).

These similarities are more than sufficient to meet Rule 8(a)'s "liberal standard for joinder." *United States* v. *McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977); *see also Cooper* v. *United States*, 08 Cr. 356 (KMK), 2015 WL 9450625, at *11 (S.D.N.Y. Dec. 22, 2015) (collecting cases regarding proper joinder of fraud counts where the conspiracies occurred at the same time and had common fraudulent goals); *United States* v. *McCabe*, No. 12 Cr. 258 at *2, 2014 WL 652941 (W.D.N.Y. Feb. 19, 2014) (denying motion to sever where counts of mortgage fraud and bank fraud covered overlapping time period, had some evidentiary overlap, and had a sufficient logical connection as they involved submitting fraudulent information and documentation to financial institutions to secure favorable loans). Indeed, Rule 8(a)'s "similar character" prong requires only a "general likeness" of offenses. *United States* v. *Werner*, 620 F.2d at 926 ("[R]equiring too precise an identity between the character of the offenses would fail to give effect to the word 'similar' succeeding the word 'same' and thus violate an elementary rule of statutory construction." (internal quotation marks and citations omitted)); *United States* v.

*Rivera*, 546 F.3d at 253.  For the reasons stated, the charged offenses easily meet that standard, and thus joinder is appropriate.

> 2.      <u>**Severance Under Rule 14 is Improper**</u>

The Defendant has not made a sufficient showing of prejudice to warrant severance under Rule 14.  The defense appears to argue that having the counts of the Indictment charged and tried together will lead the jury to (i) conclude improperly that the Defendant was more likely to commit the charged crimes or (ii) cumulate the evidence to find guilt on all of the counts.  The settled law of this Circuit plainly disposes of each of these concerns.

First, generalized concerns about potential prejudice resulting from being charged with multiple, similar, counts are insufficient to warrant severance.  Indeed, to permit severance on those grounds alone would effectively "read [Rule 8] from the books."  *Werner*, 620 F.2d at 929.  "Granting separate trials under Rule 14 simply on a showing of some adverse effect, particularly solely the adverse effect of being tried for two crimes rather than one, would reject the balance struck in Rule 8(a), since this type of 'prejudice' will exist in any Rule 8(a) case."  *Id.*

Second, as to the concern regarding cumulating evidence, the law in this Circuit is clear that such concerns "disappear" where "the accused's conduct on several separate occasions can properly be examined in detail," provided the evidence is not too confusing.  *Id.* (internal quotation marks and citation omitted); *see also United States* v. *Ezeobi*, No. 10 CR. 669 DLC, 2011 WL 3625662, at *2 (S.D.N.Y. Aug. 17, 2011) (citing *Werner*).  Here, the jury will easily be able to evaluate the AAPT Fraud and the Starship Fraud, and each of the Defendant's acts in support of those conspiracies, without any confusion.  Moreover, as is this Court's standard practice, the jury will presumably be instructed to consider each count, and the proposed supporting evidence, separately.  *See United States* v. *Felder*, No. S2 14 Cr. 546 (CM), 2016 WL 1659145, at *4 (S.D.N.Y. Apr. 22, 2016) ("While there is little doubt [the defendant] would be

better off if the jury did not hear all the bad things he is alleged to have done in each of the [separate conspiracy] counts, that is not the type of prejudice that warrants severance.  Such 'spillover prejudice' can easily and adequately be addressed through an instruction by the Court, which is standard in this district in any case involving multiple counts, that the jury must consider the evidence as to each count separately."  (internal citations omitted)).  The Defendant's generalized arguments to the contrary do not constitute a showing of substantial prejudice, and therefore severance is not warranted.  *See Gracesqui*, 2015 WL 5231168, at *4 ("A defendant must allege more than a generalized threat of jury confusion or cumulative evidence to succeed in a motion to sever.").

3.  **Evidence As to Each Count Would Be Admissible at a Trial on Any of the Counts as Direct Evidence**

Further counseling against severance is the fact that evidence as to all counts would be admissible as direct evidence of a trial on any counts.

A.  **Applicable Law**

Evidence of an uncharged act is admissible as direct evidence if the uncharged act "arose out of the same transaction or series of transactions as the charged offense"; (2) "is inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary to complete the story of the crime on trial." *United States* v. *Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *see also United States* v. *Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (explaining that some kinds of evidence offered "to show the background of a conspiracy" is not "other crimes" evidence subject to Rule 404(b), but rather "'direct proof of the charged conspiracy'"); *accord United States* v. *Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for

example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

The Second Circuit has repeatedly affirmed the admissibility of evidence fitting one or more of these descriptions, whether it relates to conduct during the period of the charged crime or before it. *See, e.g.*, *United States* v. *Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012) (following conviction after trial on campaign finance related charges, affirming district court's admission, as direct evidence, of testimony that defendant had engaged in a Ponzi scheme contemporaneously with, and arguably related to, the campaign finance violations); *United States* v. *Robinson*, 702 F.3d 22, 37-38 (2d Cir. 2012) (in child sex trafficking case, affirming admission as direct evidence and necessary to complete the story of the crimes on trial proof of defendant's calls, contemporaneous with the charged conduct, in which he discussed uncharged crimes related to prostitution and trafficking); *United States* v. *Greer*, 631 F.3d 608, 614 (2d Cir. 2011) (where defendant was charged with being a felon in possession of a firearm, affirming admissibility as direct evidence necessary to complete the story of the crime charged testimony regarding defendant's uncharged plan to commit a robbery, which immediately preceded the charged conduct); *United States* v. *Kaiser*, 609 F.3d at 571 (in securities fraud case, holding that bad acts predating the conspiracy were admissible as direct evidence, without regard to Rule 404(b), because they had carry-over effects during the conspiracy); *United States* v. *Rigas*, 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because the evidence was "'inextricably intertwined with'" the proof of the charged conspiracy and "'necessary to complete the story of the crime on trial'"); *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (in case charging false

statements to maintain a line of credit, affirming admissibility of uncharged acts of falsification of business inventory, which occurred at or around the same time as the charged crimes, as direct proof inextricably intertwined with charged conduct); *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence of pre-existing drug trafficking relationship between defendant and co-conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it). The Second Circuit has adopted an inclusionary approach to Rule 404(b) evidence, which, if relevant, can be admitted "for any purpose other than to show a defendant's criminal propensity," unless the trial judge concludes that its probative value is substantially outweighed by the prejudicial impact. *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).

### B. Discussion

Evidence related to the AAPT Fraud, Starship Fraud, Narcotics Conspiracy, and Firearm Transportation is clearly admissible as direct evidence of each of the charged schemes and acts, and is both inextricably intertwined with, and necessary to complete the story of the conduct charged in the Indictment. The Defendant's participation in the AAPT Fraud is direct evidence of the Starship Fraud, and vice versa, as the evidence of both schemes is inextricably intertwined and necessary to complete the story of the crimes on trial. That the Defendant engaged in the AAPT Fraud involving the same participants and the same categories of fraudulent misrepresentations in the years and months leading up to the start of the Starship Fraud, and then, in the middle of the Starship Fraud was continuing to carry on the AAPT Fraud, is direct proof of his knowledge in both fraudulent schemes.

Evidence of AAPT Fraud in a trial involving the Starship Fraud, and evidence of the Starship Fraud in a trial involving the AAPT Fraud, is precisely the type of evidence that the

Second Circuit has routinely held "may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Daly*, 842 F.2d at 1388. The Defendant argues, for example, that there is no "credible proof that Margulies knew that the Monster claim was false," and that "Bershan told him there was a Monster deal and that all communications he had with investors were directed by and dictated by Bershan." (Def. Mot. at 12). Yet the Defendant's creation of fake letters from Nestlé to try to dupe AAPT investors into believing that Nestlé was going to merge with AAPT, while he was committing the Starship Fraud, is direct proof of his knowledge, among other things, that there was no Monster deal for Starship. In addition to their lies about Monster acquiring Starship, the Defendant and his conspirators perpetrated the Starship Fraud through other materially false representations, including assurances about Bershan's ability to personally guarantee Starship investor funds. The fact that the Defendant had already defrauded investors in AAPT *with the very same misrepresentations* – and in fact had created fake bank statements purporting to show Bershan's considerable wealth – is direct proof of his knowledge and intent when he falsely promised Starship investors that Bershan could guarantee their investments against any loss.

Evidence of the Defendant's conduct in the AAPT Fraud and Starship Fraud at a trial on severed counts would also be properly admitted to show the nature of the relationships between the co-conspirators, and would be probative of the Defendant's knowing participation in both schemes. *See United States* v. *Mermelstein*, 487 F. Supp. 2d 242, 262 (E.D.N.Y. 2007) ("[E]vidence of the nature of the relationship between alleged co-conspirators is frequently admitted by courts."). Accordingly, courts routinely allow the Government to introduce, as direct evidence of the charged offenses, evidence that co-conspirators engaged in other criminal

conduct in the past, even where that evidence is not "substantially similar" to the charged conduct. For example, in *United States* v. *Gracesqui*, Judge Castel permitted the Government to introduce, as direct evidence, evidence that the defendant and a co-conspirator participated together in numerous uncharged robberies, including a robbery-kidnapping, "to show the development of a relationship of trust," in the lead up to the charged the murder-for-hire conspiracy. *United States* v. *Gracesqui*, No. 10-CR-74 (PKC), 2016 WL 11259074, at *2 (S.D.N.Y. June 3, 2016), aff'd, 730 F. App'x 25 (2d Cir. 2018); *accord United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (holding that prior acts evidence can be admitted as background evidence in a conspiracy case "to explain how a criminal relationship developed" or "to help the jury understand the basis for the co-conspirators' relationship of mutual trust"). Evidence that the Defendant and his co-conspirators engaged in multiple fraudulent schemes is relevant to show, among other things, the nature of the Defendant's relationship with his co-conspirators.

The Court should reject the Defendant's arguments to the contrary. Particularly where, as here, the Defendant appears to be furthering a "mere presence" defense – that, although he was involved in multiple aspects of both schemes, directly communicating with investors, creating fraudulent documents to perpetrate both schemes, and taking steps to cover up the conspirators' crimes by trying to mollify angry investors – he was nonetheless only a "marketing" person, merely passing along information provided to him by others, and not a knowing participant. But the fact that the Defendant participated in both schemes in overlapping periods of time over the course of more than four years, propagating many of the same categories of lies with respect to each scheme and working with the same co-conspirators, substantially undercuts this argument. *Cf. United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996) ("The challenged evidence legitimately tended to prove the nature of the relationship between Flores

and the other conspirators, to explain why Garcia asked Flores to participate in the pick-up, and to explain why Garcia trusted Flores as a co-conspirator. Without evidence of a prior relationship or explanation of a connection with Garcia, Flores's 'mere presence' defense would be much stronger, particularly because the locale of the pick-up was a shopping center.").  In addition, the AAPT Fraud evidence and the Starship Fraud evidence in a trial on either scheme would complete the story of the crime on trial, and, more generally, to present a case with "'with evidentiary richness and narrative integrity.'"  *See, e.g.*, *United States v. Ahmed*, No. 14 Cr. 277 (DLI), 2016 WL 8732355, at *10 (E.D.N.Y. June 24, 2016) (quoting *Old Chief* v. *United States*, 519 U.S. 172, 183 (1997)).

Likewise, the Defendant's supply of cocaine to Bershan throughout both conspiracies and his illegal transfer of a firearm to her are also admissible as direct evidence of both the AAPT Fraud and Starship Fraud schemes.  These acts amply demonstrate the nature of the relationship between the Defendant and Bershan, and her dependence on him to supply her with cocaine and to buy and send her a gun wholly undercut his argument that he was somehow duped by Bershan, who relied and depended on *the Defendant* for perceived critical needs.  The Defendant's transfer of the firearm also demonstrates that the Defendant, who apparently will disclaim any awareness of any fraud, was well aware during the schemes that certain Starship investors felt victimized by Bershan.

4. **Evidence As to Each Count Would Also Be Admissible at a Trial on Any of the Counts as Rule 404(b) Evidence**

An additional factor weighing against severance is that evidence as to each count, even if it were not admissible as direct evidence, would be admissible as Rule 404(b) evidence at any trial of severed counts.  Such evidence could be used to establish the Defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of

accident – all of which are proper bases for admission under Rule 404(b) and are highly

probative of the charged conduct.

A.      Applicable Law

While prohibiting the introduction of other act evidence to prove that the Defendant has a

propensity to commit the offenses charged, Rule 404(b) explicitly allows admission of such

evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan,

knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).  The Second

Circuit has adopted an "'inclusionary' approach" to Rule 404(b), under which "all 'other act'

evidence is generally admissible unless it serves the *sole* purpose of showing a defendant's bad

character."  *United States* v. *Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012); *see also United States* v.

*Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ("'Other act' evidence serves a proper purpose so long as

it is not offered to show the defendant's propensity to commit the offense.").  To determine

admissibility under Rule 404(b), the Court should consider whether (1) the evidence is offered

for a proper purpose; (2) the evidence is relevant to a disputed issue; and (3) the probative value

of the evidence is substantially outweighed by its prejudicial effect.  *Curley*, 639 F.3d at 56-57.

In addition, the Court should give an appropriate limiting instruction to accompany any such

evidence, if the defense so requests.  *Id.*

B.      Discussion

Here, evidence related to the AAPT Fraud, the Starship Fraud, the Narcotics Conspiracy,

and the Firearm Transportation is also admissible pursuant to Rule 404(b) to show the

Defendant's motive, opportunity, intent, preparation, plan, and knowledge, especially in light of

the Defendant's expected defense that he was duped by Bershan and Schwartz into participating

in what he believed to be legitimate fundraising efforts for AAPT and Starship.  Even if prior

24

offenses need to be "similar" to be charged conduct to be admissible as evidence of knowledge or intent under Rule 404(b), they need not be identical. *United States* v. *Inserra,* 34 F.3d 83, 89 (2d Cir. 1994) (prior false oral statements to the Department of Labor regarding pension fund in a prior case showed the defendant's intent to make false written statements to the United States Probation Office regarding personal assets in a different case); *United States* v. *Smith,* 727 F.2d 214, 220 (2d Cir. 1984) (evidence that investment broker previously caused investors to file false documents with regulatory agency shows intent to defraud investors in present scheme). Here, the AAPT Fraud and Starship Fraud involve the same or similar crimes – wire fraud and securities fraud – and, moreover, overlapping participants and time periods. Thus, even if the frauds are not mirror images of each other, they are sufficiently similar to be admitted under Rule 404(b) as evidence of knowledge and intent.

Likewise, the evidence of the Firearm Transportation – including that the firearm was purchased with misappropriated Starship funds to help Bershan feel protected in the wake of Starship investor threats – would be offered in a trial on the AAPT Fraud Counts and the Starship Fraud Counts as proof of the Defendant's knowledge and intent. Such evidence demonstrates that the Defendant knew that there was a fraud and intended to participate in its aims, in part because he was aware that victims were so upset about having been defrauded that Bershan felt the need to protect herself from them. Nor is the probative value of this evidence "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Rule 403 generally does not preclude evidence of prior criminal conduct when that prior conduct is not "any more sensational or disturbing" than the charged crime. *Pitre*, 960 F.2d at 1120 (citation omitted); *see also United States* v. *Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (finding no error in district court's admission of uncharged criminal conduct when the evidence "did not involve

conduct more serious than the charged crime"); *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (Rule 403 did not preclude evidence of prior narcotics transactions that "did not involve conduct any more sensational or disturbing" than the charged crime); *United States* v. *Smith*, 727 F.2d 214, 220 (2d Cir. 1984) (essential inquiry under Rule 403 for admission of other crimes evidence is whether it involves "conduct likely to arouse irrational passions"). Here, the character of the evidence is not more "sensational" or "disturbing" for the AAPT Fraud Counts such that it would prejudice a trial on the Starship Fraud Counts. *See generally Roldan-Zapata*, 916 F.2d at 804. It further strains credulity to argue that engaging in a repeated pattern of fraudulent acts over the course of more than four years with the same conspirators in order to strip victim investors of millions of dollars would be any more or less sensational than sending a firearm (purchased with the victim investor funds to protect against perceived threats from a victim investor) to a co-conspirator during the course of those fraudulent schemes. Nor would such evidence "unfairly excite emotions" against the Defendant. *United States* v. *Massino*, 546 F.3d 123, 133 (2d Cir. 2008) (internal quotation marks and citation omitted).

Finally, the Defendant argues that evidence of the AAPT Fraud and Starship Fraud would be inadmissible as 404(b) evidence in separate trials because such evidence is insufficient, and the Government "cannot make a prima facie showing that [the Defendant] knowingly intended to defraud AAP investors or Starship investors." (Def. Mot. at 11-12.) The Court should reject this argument outright. These are hardly the uncharged acts contemplated in *Huddleston*, cited by the Defendant for the proposition that "[i]n the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston* v. *United States*, 485 U.S. 681, 689 (1988). In *Huddleston*, the defendant was charged with one count of selling stolen goods in interstate commerce, and one count of

possessing stolen property in interstate commerce. *Id.* at 682. Both counts related to portions of a shipment of videocassette tapes that the defendant was alleged to have possessed and sold, knowing that they were stolen. *Id.* At trial, the Government introduced evidence that the defendant possessed and sold televisions he received from the same source as the videocassettes and that were also stolen, on the theory that proof that the defendant had engaged in a series of sales of stolen merchandise from the same suspicious source was strong evidence that the defendant was aware that the videocassette tapes were also stolen. *Id.* at 687. On appeal, the defendant argued that the trial court must make a "preliminary finding by at least a preponderance of the evidence" that the defendant had committed the uncharged act. *Id.* The Supreme Court rejected that position, holding, instead, that "'similar' acts evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." *Id.* Here, the Government has overwhelming evidence of Defendant's charged conduct in the AAPT Fraud and the Starship Fraud to support a finding by the jury that the Defendant knowingly participated in those schemes. The Defendant takes too myopic a view of the Government's evidence when he argues that "due to the extreme lack of credibility of the co-defendants . . . the Government cannot meet the evidentiary threshold for the admission of the AAP[T] scheme in the proof of the Starship scheme[.]" (Def. Mot. at 12). The Court should reject the Defendant's "sufficiency" arguments regarding the Government's proof of the AAPT Fraud and Starship Fraud.

Because evidence of all the crimes charged in the Indictment would be admissible as, at least, 404(b) evidence at any trial on severed counts, severance is not appropriate. *See, e.g.*, *Werner*, 620 F.2d at 930 (upholding denial of severance motion, and noting in particular that severance was not appropriate since evidence of one of the counts would be admissible at a trial

on the other); *Chidi Ezeobi*, 2011 WL 3625662, at *3 (relying, in part, on the fact that evidence on each count would be admissible at the trial of the other in rejecting severance motion).

## II.    MARGULIES' MOTION *IN LIMINE* SHOULD BE DENIED

The Defendant also prematurely moves to preclude "evidence from severed counts being used in the trial of remaining count(s)." As explained above, the fact that evidence of *all* the Defendant's charged wrongdoing would be admissible – either as direct evidence or as 404(b) evidence – at any trial involving severed counts counsels against severance. The Government respectfully suggests that once the Court rules on the Defendant's motion for severance, and the contours of the actual trial are established, the parties be permitted to file appropriate motions *in limine*. To debate motions *in limine* in the context of hypothetically-severed counts does not seem fruitful.

## III.    MARGULIES' MOTION FOR ATTORNEY-CONDUCTED VOIR DIRE IS MERITLESS AND SHOULD BE DENIED

Margulies moves for the Court to permit attorney-conducted voir dire in this case on the grounds that attorney-conducted voir dire "results in jurors revealing much more information about potential bias or prejudice" and promotes judicial economy. (Dkt # 96, at 3-4). Neither of these unsubstantiated reasons warrants a departure from the usual practice of court-conducted voir dire in this District.

Rule 24(a)(1) of the Federal Rules of Criminal Procedure states that "[t]he court may examine prospective jurors or may permit the attorneys for the parties to do so." Fed. R. Crim. P. 24. It is settled law that a trial court has broad discretion over the manner in which prospective jurors are examined and that the refusal to allow counsel to conduct the voir dire is not an abuse of that discretion. *See Rosales-Lopez* v. *United States,* 451 U.S. 182, 189 (1981) ("[F]ederal judges have been accorded ample discretion in determining how best to conduct the voir dire.");

*United States* v. *L'Hoste,* 609 F.2d 796 (5th Cir. 1980) (trial court is given wide discretion in

deciding how to conduct voir dire), *cert. denied*, 449 U.S. 833 (1980); *United States* v. *Duncan*,

598 F.2d 839 (4th Cir. 1979) (same), *cert. denied*, 444 U.S. 871 (1979); *United States* v.

*Johnson*, 584 F.2d 148 (6th Cir. 1978) (same), *cert. denied*, 440 U.S. 918 (1979); *United States*

v. *Brown*, 540 F.2d 364 (8th Cir. 1976) (same); *United States* v. *Addington*, 471 F.2d 560 (10th

Cir. 1973) (same);  *United States* v. *Addonizio,* 451 F.2d 49 (3rd Cir. 1971) (same), *cert. denied*,

405 U.S. 936, *rehearing denied* 405 U.S. 1048 (1971).

Although courts may, at their discretion, permit attorneys to participate in the voir dire of

potential jurors, this practice is generally frowned upon. "Attorney-driven voir dire is disfavored,

since the opportunity is often abused to delay and to prejudice the jury." *United States* v.

*Taveras*, 436 F.Supp.2d 493, 504 (E.D.N.Y. 2006) (Weinstein, J.),*aff'd in part, rev'd in part on

other grounds*, *United States* v. *Pepin*, 514 F.3d 193 (2d Cir. 2008). The Second Circuit has

noted the tension among the following competing ideals in the process of selecting a jury: "the

need to protect jurors, the goal of promoting efficiency in the conduct of criminal trials without

doing damage to the right of a criminal defendant to an unbiased and impartial jury, and the

desire of the defendant to know as much as possible about those who sit in judgment on him."

*United States* v. *Barnes*, 604 F.2d 121, 142 n.10 (2d Cir. 1979).

Margulies fails to identify any factors particular to this case that would justify a departure

from the custom of court-conducted voir dire that has long existed in this District and this

Circuit. He cites no case law in support of his vague argument that, in general, attorneys for the

defense and the prosecution are better positioned than the court to examine jurors in a manner

that is both comprehensive and efficient. Given the potential for attorney-led voir dire to cause

delay and to prejudice the potential jurors, the Court should, in its discretion, deny Margulies' motion.

## IV. MARGULIES' MOTION *IN LIMINE* REGARDING CO-DEFENDANTS' SENTENCING EXPOSURE

Margulies moves *in limine* for permission to cross-examine the Government's cooperating witnesses about their sentencing exposure. With certain limitations explained below, the Government does not object to defense cross-examination of Lisa Bershan regarding her sentencing exposure.

To begin, Margulies is incorrect in "presume[ing]" that Lisa Bershan and Barry Schwartz, the two individuals with whom Margulies was charged in the original Indictment, "will testify against Margulies in an effort to earn a substantial assistance sentencing guideline reduction." (Dkt # 97, at 2). At this time, the Government represents that it has not entered into a cooperation agreement with Schwartz, and does not anticipate calling him as a witness at any trial of Margulies.

The Government does not object to defense cross-examination of Bershan regarding the charges to which she has pled guilty, the maximum and minimum statutory terms of imprisonment that she faces as a result of her conviction on those charges, the reduced sentence she hopes to obtain from the sentencing court as a result of her cooperation, and her understanding of the role that a 5K1.1 letter would play in the process. However, the Government does object to any questions regarding Bershan's "guideline range" or "guideline score." (*Id.* at 3). Bershan's plea agreement does not contain an agreed-upon "guideline range" or "guideline score," as is typical in the plea agreements for cooperating witnesses in this District. Thus, there is no basis for Bershan to have any understanding, much less an accurate understanding, of how the sentencing Guidelines would operate in her case. Indeed, because the

Government has not discussed Bershan's Guidelines range with her, her understanding, if any, of her Guidelines' range is likely to be based on her privileged communications with her attorney. Moreover, the Government submits that cross-examination of Bershan regarding the maximum and minimum terms of imprisonment she faces – which terms are clearly set forth in her plea agreement – would aptly demonstrate Bershan's understanding of the benefit she hopes to receive by cooperating with the Government.

## V.     MARGULIES' MOTION FOR ITEMIZED DISCLOSURE OF *GIGLIO* AND *BRADY* MATERIAL SHOULD BE DENIED

Margulies requests that the Court order the Government to produce "[a]ny impeachment information regarding Bershan and Schwartz," including information enumerated in a seven-item list.  (Dkt #98, at 5).

The Government recognizes its obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny.  Pursuant to these obligations and out of an abundance of caution, the Government made a detailed disclosure of information to Margulies on or about December 26, 2018.  To the extent that potential *Brady* information comes to light, the Government will provide timely disclosure of such information.  The Government will provide material under *Giglio* v. *United States*, 405 U.S. 150, 154 (1972), and its progeny, in a timely manner prior to trial.  The Government has provided discovery pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure.  To the extent that the Government comes into possession of additional discovery, it will provide timely production of such material.

Because the Government has acted, and will continue to act, in accordance with its obligations pursuant to *Brady*, *Giglio*, and Rule 16, the Court should deny Margulies' motion.

## CONCLUSION

For the reasons set forth above, this Court should deny the Defendant's motion to sever on the merits and should deny the motion *in limine* as premature. The Court should also deny the Defendant's motions for attorney-conducted voir dire and itemized disclosure of *Giglio* and *Brady* material, and allow cross-examination of any cooperating witnesses to (a) whether the witness has pled guilty, (b) the maximum and minimum statutory terms of imprisonment that the witness faces as a result of her conviction on those charges, (c) the reduced sentence the witness hopes to obtain from the sentencing court as a result of her cooperation, and (d) the witness' understanding of the role that a 5K1.1 letter would play in the process.

Dated:      New York, New York
January 18, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By: _/s/ Negar Tekeei_____
Negar Tekeei
Christine I. Magdo
Assistant United States Attorneys
Southern District of New York
(212) 637- 2242 / 2297